UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:06-CR-71(01)RM |
| | ) | |
| KEITH ABDUL JENNINGS | ) | |

OPINION and ORDER

This case came before the court on August 31 and September 8, 2006 for hearing on defendant Keith Jennings' motion to suppress. For the reasons that follow, the court denies the motion.

I.

On May 3, 2006, Sgt. Timothy Medich of the Metro Special Operations Section applied for a warrant to search for narcotics, cocaine, and other drug materials at a dwelling at 428 S. 27th Street (a duplex multi family apartment) in South Bend, and "the person of Edward Smith Jr., male black, 25 years of age, tall and thin with short black hair." A source had engaged in a controlled purchase of crack cocaine from Mr. Smith within the previous 48 hours, and numerous children and young adults had been seen coming and going from the apartment. St. Joseph Circuit Court Judge Michael G. Gotsch issued the search warrant the same day.

A briefing on how to approach the residence was conducted at the South Bend Police Department before the warrant was executed that evening. The SWAT

unit was to be deployed to make entry in the rear of the home. As officers received their instructions at Central Station, two other officers served as "eyeballs" by keeping watch on the residence during that briefing: Sgt. Chuck Flanagan watched the front area of the residence and Sgt. Medich watched the rear from a vantage point about 150 feet to the east. At that location, 27th Street is less than 300 feet long, running south off Jefferson Boulevard into a cul-de-sac that forms a parking lot. Several duplex apartment buildings are located around the parking lot. There are no driveways. There is no outlet.

MSOS officers and the South Bend Police Department's SWAT team executed the warrant around 9:33 p.m. The SWAT team was to make entry through the apartment's rear, or south, door. As the SWAT team approached the residence via an alley in the rear, five MSOS officers in an unmarked Dodge Caravan driven by Sgt. John Mortakis joined Sgt. Flanagan to secure the perimeter on the front (north) of the residence.

Police executing a narcotics search warrant establish a perimeter for the safety of officers and others in the community. In executing such warrants, police have found handguns under porches and armed persons coming and going from the premises to be searched. People close enough to see the entry team have been known to alert persons inside by cell phone before police entry can be made. Accordingly, police want to secure, pat down, and identify anyone in the immediate vicinity of the place to be searched.

The following events took place in roughly 60 seconds.

2

Less than a minute before arrival and entry, the SWAT team asked by radio whether there had been any change at the apartment and was told that there had not been. Sgt. Mortakis then drove his van into 27th Street, focused on the apartment, and parked to the side of the street. Also at that point, pursuant to routine and pre-arranged procedure, radio traffic ceased.

Sgt. Flanagan and Sgt. Mortakis were surprised to see a white two-door Cadillac El Dorado[1] pull past Sgt. Mortakis' van into the parking lot and park, faced east, in the parking place north of and nearest to the apartment to be searched. The Cadillac was less than 35 feet from the front of the apartment about to be searched. Defendant Keith Jennings was driving the Cadillac, though none of the officers knew it at the time. Sgt. Dave Wells rammed the apartment's rear door open while a "distraction device" was set off to disorient persons inside the home. Sgt. Mortakis saw SWAT team movement between buildings.[2]

The Cadillac's lights indicated that reverse gear had been engaged, and the car began backing up to the west.[3] Sgt. Mortakis and Sgt. Flanagan blocked the Cadillac with their vehicles, and officers—weapons in hand because of the possibility of an occupant's flight in their direction—rapidly approached the car.

_____

[1] The Cadillac had license plate number 71T7120 and was later determined to be registered to Davanda F. Talton of 125 S. Logan Street in South Bend.

[2] Sgt. Flanagan believes he saw the Cadillac's occupants get out of the car, walk to the front of the car, then walk quickly back to the car about the time the SWAT team members came into view. None of the other officers saw anyone get out of the car at that point, and the court cannot envision those events occurring in so short a time frame.

[3] Sgt. Mortakis already had committed to pulling in behind the Cadillac before it went into reverse.

Had the officers proceeded past the Cadillac toward the apartment, the officers would have been outflanked.

The officers were wearing very dark clothing, marked with lettering identifying them as police; at least three undercover officers were masked. Cpl. Robert D. Wise ordered the driver to show his hands, but Mr. Jennings didn't do so; Cpl. Wise believes that with everything else going on, Mr. Jennings' attention was simply directed elsewhere. Sgt. Flanagan believed he saw Mr. Jennings make furtive movements toward the center arm rest, then place a clear plastic bag containing a white rock like substance underneath the center counsel arm rest. Police ordered Mr. Jennings out of the vehicle. Sgt. Flanagan saw the bag with a white rock-like substance as he removed Mr. Jennings from the car and recognized the driver as Mr. Jennings.

Sgt. Flanagan seized Mr. Jennings' telephone and found that the phone had received a call at 9:10 p.m. from a phone at 428 S. 27th Street with the number 289-4839, and no calls had been made to that residence. Sgt. Flanagan told Mr. Jennings he was executing a narcotics search warrant at 428 S. 27th Street. Mr. Jennings said he had nothing to do with that. Front-seat passenger Diallo Maddox told police he didn't understand what was going on and that Mr. Jennings had been in the area to visit a female. Mr. Jennings said he was visiting a person named Sara. When the white substance in the bag tested positive for crack cocaine, the police arrested Mr. Jennings and seized the bag and its contents and cash and papers from the car.

II.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Any search conducted without a warrant is presumed to be unreasonable, Katz v. United States, 389 U.S. 347, 357 (1967), though the law recognizes many exceptions to the warrant requirement. The parties appear to agree that Mr. Jennings was seized, for constitutional purposes, when police blocked his car in: "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). Although the police had a warrant to search the premises at 428 S. 27th Street, the seizure and search of Mr. Jennings was warrantless: the warrant that Judge Gotsch issued did not call for the search of people outside the apartment. Accordingly, the government must establish the applicability of an exception to the warrant requirement or establish that the seizure was otherwise reasonable.

"A stop for questioning is reasonable if the police officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion' as measured by an objective standard." United States v. Vite-Espinoza, 342 F.3d 462, 466 (6th Cir. 2003) (*quoting* Terry v. Ohio, 392 U.S. 1, 21-22 (1968)). This, though, is not the ordinary Terry case, in which the court must evaluate whether an officer had sufficient grounds for a reasonable suspicion of criminal activity. *See, e.g.,* United States v. Askew, 403 F.3d 496, 507-508 (7th Cir. 2005); United States v. Baskin, 401 F.3d

788, 791-792 (7th Cir. 2005). Of the officers who stopped Mr. Jennings, only one[4] cited the possibility that the Cadillac's occupants were themselves engaged in criminal activity. The other officers testified that they participated in the stop solely because the Cadillac was within the perimeter they had established, triggering a need to get its occupants out of the car and onto the ground (to protect them from weaponry) and to ascertain who they were (lest they be connected with the place being searched). One officer testified credibly that he would have treated a priest or an Avon lady within the perimeter no differently.

Nor is this an ordinary Terry case in which a court must evaluate whether the force used during a stop, or the duration of a brief detention, were so disproportionate to the purpose of the police action as to convert a Terry stop into an arrest that required probable cause. *See, e.g.,* United States v. Goodwin, 449 F.3d 766 (7th Cir. 2006) (detention of luggage for dog sniff); Thurman v. Village of Homewood, 446 F.3d 682, 686 (7th Cir. 2006) (twenty-five minutes to see if detainee was police officer); United States v. Ienco, 182 F.3d 517, 524-525 (7th Cir. 1999) (retaining wallet and driver's license). Mr. Jennings' detention consisted of blocking the Cadillac's path as it began to back away. The detention lasted only seconds until probable cause arose when the police officers saw Mr. Jennings trying to hide a clear plastic bag containing a white rock-like substance, while seated in a car only yards from an apartment where an informant had purchased

---

[4] Sgt. Mortakis, based on his years of narcotics investigation and seeing the Cadillac in the perimeter, believed the car's occupants were either picking up drugs or dropping drugs off.

crack cocaine less than 48 hours earlier. The officers had their guns drawn, but it is unlikely Mr. Jennings saw those guns before the police saw the plastic bag. In any event, courts have upheld displays of firearms during Terry stops if the reason for the stop warrants such displays. *See, e.g.,* United States v. Vega, 72 F.3d 507, 516 (7th Cir. 1995); United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994).

Mr. Jennings argues that Ybarra v. Illinois, 444 U.S. 85 (1979), makes the unreasonableness of his detention clear. In Ybarra, a warrant authorized the search of a tavern and its bartender because of information that the bartender was selling packets of heroin in the tavern. At the tavern, officers announced they would be conducting a cursory search of all patrons for weapons. Heroin was found on one patron—Ybarra. The Supreme Court held that the search of Ybarra was invalid because one's mere proximity to others independently suspected of criminal activity does not give rise to probable cause to search that person. The Court rejected the State's Terry argument because the officers could articulate no particularized suspicion that Ybarra (or any other bar patron) was engaged in criminal activity.

The government argues that Mr. Jennings' detention finds support in Michigan v. Summers, 452 U.S. 692 (1981), which held that police who are executing a search warrant on a residence may detain the occupants of the residence during the search.

More recent cases address fact situations more closely analogous to the May 3rd events on 27th Street than either Ybarra v. Illinois or Michigan v. Summers. In Baker v. Monroe Township, 50 F.3d 1186 (3rd Cir. 1995), as police executing a narcotics search warrant ran toward the premises to be searched, they encountered the Baker family—a mother, her 17-year-old son, and her 15-year-old daughter, on the front steps. They ordered the Bakers to "get down," handcuffed them, and held them at gunpoint for ten minutes, searching purses and wallets. It turned out the Bakers were dinner guests arriving for dinner. The Bakers sued the police and the township under 42 U.S.C. § 1983 alleging, among other things, violation of their rights to be free from unreasonable search and seizure.

The lead officer explained the "get down" order (the initial detention) as customary practice, undertaken for the safety of the police and the safety of people they pass on their way to the search. The unannounced execution of a narcotics search warrant might result in violence, and part of the reason for getting bystanders to the ground is to protect them from stray gunshots. Further, citizens standing in the middle of the raid could prevent the police officers from defending themselves by returning fire. The officer explained that at the point of the encounter, the officers didn't know whether the Bakers were coming or going, or whether they were the occupants of the residence to be searched. The officer also said that at the instant he encountered the Bakers, he did not know whether the

8

Bakers were coming to or going from the house, nor did he know whether they were the very people whose house he had a warrant to search.

The court of appeals rejected the Bakers' claim of unlawful search and seizure, explaining that the police conduct was reasonable under two exceptions to the warrant requirement. The first exception was that of Michigan v. Summers, 452 U.S. 692, discussed above. The court noted that execution of narcotics warrants produce peculiar threats: "The dangerousness of chaos is quite pronounced in a drug raid, where the occupants are likely to be armed, where the police are certainly armed, and the nature of the suspected drug operation would involve a great deal of coming and going by drug customers." 50 F.3d at 1191. Further, while the Bakers were not known to be occupants, "it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there." 50 F.3d at 1192.

The second exception upon which the Baker court relied was the exception in Terry v. Ohio, 392 U.S. 1 (1968), which allows police to conduct investigatory stops not amounting to arrest as long as the degree of intrusion upon the citizen is not disproportionate to the officer's reason for stopping the citizen:

> [T]he need to ascertain the Bakers' identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable to get the Bakers down on the ground for a few crucial minutes. Armstrong's initial order to "get down" and the other officers' actions in pushing the Bakers down to the ground did not constitute a Fourth Amendment violation.

Baker v. Monroe Township, 50 F.3d at 1192.

In <u>United States v. Bohannon</u>, 225 F.3d 615 (6th Cir. 2000), law enforcement agents were completing the execution of a search warrant on a suspected methamphetamine lab. Two agents were at their car, ready to leave, when James and Johnny Bohannon drove up at a high rate of speed, stopped near the front door, and walked quickly toward the residence. The agents stopped the Bohannons and asked for identification. Suspicious behavior led to a pat-down that disclosed methamphetamine and a handgun on James Bohannon's person, followed by a post-arrest confession to operating a meth lab, and a consensual fruitful search of Mr. Bohannon's residence. Mr. Bohannon moved to suppress because the initial stop violated the Fourth Amendment.

The court of appeals held the stop was permissible under <u>Michigan v. Summers</u>. That Mr. Bohannon was not a resident didn't take his situation outside the scope of <u>Summers</u> because officer safety and the need to prevent flight remain as legitimate bases for the detention of a non-resident. That Mr. Bohannon was not inside the house did not affect his case:

> The policy justifications of *Summers* and [*United States v. Fountain,* 2 F.3d 656 (6th Cir. 1993)], especially to protect officers' safety, are applicable in this case. "The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances." *United States v. Patterson,* 885 F.2d 483, 485 (8th Cir. 1989). Furthermore, because James showed every intention of walking into the house where armed officers were in the process of completing the search, his safety was also at risk. Preventing his unexpected entry into the trailer was for the safety of everyone involved.

United States v. Bohannon, 225 F.3d at 617.

In Burchett v. Kiefer, 310 F.3d 937 (6th Cir. 2002), police executed a narcotics search warrant on the residence of a man named Burchett. The suspect's brother Charles lived next door and walked over to the property line to see what was going on. Seeing masked men dressed in black, Charles turned back toward his own home, disregarding an order to get down on the ground. Police pursued as Charles ran to his front porch, where his baby was in a swing. Charles was handcuffed, charged with disorderly conduct, and placed in the back seat of a police car while the search warrant was executed. He sued, claiming unreasonable detention. The court of appeals affirmed the award of summary judgment to the defendants on that claim, holding

> that officers act within their *Summers* powers when they detain an individual who approaches a property being searched pursuant to a warrant, pauses at the property line, and flees when the officers instruct him to get down. Although this reaches beyond *Summers's* "occupants" language, it is consistent with the policies that *Summers* identified. Burchett's presence on the property line and his flight upon encountering the officers would suggest to a reasonable law enforcement official that he posed a similar risk of flight and danger to others as an individual who arrived at the premises during a search. That officers arrived and sought to detain him—in the most minimal sense, at first, by yelling for him to get down—while he was still one step away from the property line seems like an arbitrary distinction that would undermine the policies expressed in *Summers.* We therefore conclude that the officers' detention of Burchett did not violate his Fourth Amendment rights.

Burchett v. Kiefer, 310 F.3d at 944 (citation omitted).

This case is not Baker: Mr. Jennings was not on the doorstep of the apartment to be searched; he was in his car in a parking place 30 to 35 feet away

11

from the apartment. This case is not <u>Bohannon</u>: Mr. Jennings was not walking quickly to the door of the apartment when he was detained. This case is not <u>Burchett</u>: Mr. Jennings was not ordered to get down on the ground before being detained more decisively.

Further, those are court of appeals decisions that are trumped, if they are inconsistent, by Supreme Court's holding in <u>Ybarra v. Illinois</u>, which remains good law. Those cases are not inconsistent with <u>Ybarra</u>. Although the Fourth Amendment protects people rather than places, <u>Katz v. United States</u>, 389 U.S. at 351-352; *see also* <u>Rakas v. Illinois</u>, 439 U.S. 128, 138-143 (1978), the place in which events are expected to occur is a necessary part of the reasonableness inquiry. *Compare* <u>Brown v. Texas</u>, 443 U.S. 47, 52 (1979) (can't stop person for mere presence in neighborhood with high drug-activity), *with* <u>United States v. Jackson</u>, 300 F.3d 740, 746 (7th Cir. 2002) (upholding stop of known felon walking in high-crime area in middle of night). <u>Ybarra</u> involved a place of public accommodation. Probable cause existed in <u>Baker</u>, <u>Bohannon</u>, and <u>Burchett</u> to believe the places involved were being used in the manufacture or trade of narcotics, but the places were not otherwise open to the public. The danger to the police and the public is quite different when no one present can be thought to be a legitimate business invitee.

The holdings of <u>Baker</u>, <u>Bohannon</u>, and <u>Burchett</u> demonstrate the reasonableness of the police conduct in this case. Those cases teach that officers executing a narcotics search warrant need not confine their attention to the area

contained by the walls of the building they are authorized to search. They may detain—briefly, and with no more than reasonable force—those whose presence adjacent to the scene of a search poses a potential significant risk to the officers or to the persons detained. They may detain persons who might be occupants, and if the premises have a history of people coming and going frequently, those who might be customers or suppliers. People who draw near a place where a narcotics search warrant is in the beginning stages of execution are, at best, in danger and, at worst, may be threats themselves or confederates of those operating from the place to be searched.

There may be factual situations in which it would be unreasonable for police to act as they did here. But under the facts of this case, it was reasonable to seize the occupants of the Cadillac. As noted earlier, courts have upheld the display of firearms during a warrantless seizure if it is consistent with the reason for the seizure. *See, e.g.,* United States v. Vega, 72 F.3d 507, 516 (7th Cir. 1995); United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994). Given the circumstances of this detention, the display of the firearms did not convert the stop into an arrest.


## III.

Mr. Jennings had the misfortune to penetrate the perimeter police had established for safety purposes during the immediately imminent execution of a narcotics search warrant on a suspected crack house. It was reasonable and constitutional for the police to detain him long enough to protect him and to

13

identify him. During that detention, they saw what they believed to be contraband in plain view. Use of that evidence at trial will not offend the constitution. The defendant's motion to suppress [docket # ] is DENIED.

SO ORDERED.

ENTERED:   September 15, 2006   


  /s/ Robert L. Miller, Jr.   
Chief Judge
United States District Court

cc:   W. Grimmer
      D. Jones
      K. Jennings